UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICUS MORTGAGE CORPORATION
f/k/a ALLIED HOME MORTGAGE
CAPITAL CORPORATION,
    Plaintiff,

   v.

IRENE MARK, as Personal
Representative of the Estate
of Peter Belli, Deceased,
    Defendant,

    and

DIAMOND FUNDING CORPORATION,
    Trustee Process
    Defendant.

CIVIL ACTION NO.
12-10158-GAO

**REPORT AND RECOMMENDATION RE:**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 138)**

**July 11, 2014**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment

filed by defendant Irene Mark ("Mark"), as Personal

Representative of the Estate of Peter Belli ("Belli"), and

trustee process defendant Diamond Funding Corporation ("Diamond

Funding"), a retail mortgage corporation.[1]  (Docket Entry # 138).

Plaintiff Americus Mortgage Corporation f/k/a Allied Home

Mortgage Capital Corporation ("Americus") opposes the motion.

---

[1] Defendant Irene Mark, as Personal Representative of the
Estate of Peter Belli, and trustee process defendant Diamond
Funding Corporation are collectively referred to as "defendants."

(Docket Entry # 150).

PROCEDURAL BACKGROUND

As set forth in the second amended complaint, Americus seeks to collect monies owed under a final judgment issued on March 8, 2011, in <u>Allied Home Mortgage Capital Corporation v. Peter Belli and Regency Service Company, Inc.</u>, Civil Action No. 07-11597-NG ("the Allied court" or "the Allied case"). During discovery, Belli and his company Regency Service Company, Inc. ("Regency") repeatedly refused to abide by judicial orders, pay sanctions and participate in the discovery process thereby resulting in a default judgment as a sanction in September 2009. After conducting a damages hearing, the Allied court entered the final judgment. The final judgment awarded Allied Home Mortgage Capital Corporation ("AHMCC"), a nationwide mortgage banker and broker, $2,394,857.20 with interest at 12% per annum and costs of $10,928.49. The First Circuit affirmed the judgment. (Docket Entry # 140-2). Efforts by AHMCC, which changed its name to Americus,[2] to collect the judgment have not been successful.

Count One in this action seeks to enforce the judgment rendered by the Allied court. The second amended complaint alleges that Diamond Funding "possesses property of Belli, the judgment debtor, specifically wages and his ownership, equitable

---

[2] This court previously allowed a motion to amend (Docket Entry # 104) to reflect the corporate name change.

and/or benefit [sic] interest in the assets of Diamond Funding."
(Docket Entry # 104-1, ¶ 16). Count Two therefore sets out a
common law reach and apply claim and Count Three sets out a
statutory reach and apply claim against Diamond Funding.[3] In
Count Four, a claim under the Uniform Fraudulent Transfer Act
("UFTA"),[4] Americus contends that Belli provided funds to Mark in
2008 to purchase Diamond Funding with the knowledge that
providing such funds would render him "insolvent or otherwise
unable to pay any judgment obtained by Allied against him."
(Docket Entry # 104-1, ¶ 43). Belli also purportedly transferred
furniture and other equipment to Diamond Funding in 2008 to
hinder and delay Americus' ability to collect the 2011 judgment
against Belli. Belli and Diamond Funding seek summary judgment
on all counts.

   After filing this action in January 2012, Americus filed a
second action in May 2012 to collect the monies owed under the
same final judgment, <u>Americus Mortgage Corporation f/k/a Allied</u>

---

[3] The complaint cites Massachusetts General Laws chapter
213, section three, for the statutory reach and apply claim in
Count Three. This statute sets out rules for the Massachusetts
Superior Court. Accordingly, this court construes the count as
brought under Massachusetts General Laws chapter 214, section
three, which sets out a statutory reach and apply cause of
action. <u>See</u> <u>Hunter v. Youthstream Media Networks, Inc.</u>, 241
F.Supp.2d 52, 57 (D.Mass. 2002) ("Massachusetts General Laws
chapter 214, § 3(6) is the reach and apply statute in the
Commonwealth").

[4] Massachusetts General Laws chapter 109A, sections one to
12 ("UFTA" or "section 109A").

<u>Home Mortgage Capital Corporation v. The Estate of Peter Belli</u>
<u>and Irene Mark</u>, Civil Action No. 12-10861-GAO ("the Americus
case").  The complaint names the Estate of Peter Belli as
judgment debtor and Mark as a reach and apply defendant.  Similar
to the present action, Count One seeks to enforce the judgment.
(Docket Entry # 1).  Counts two and three respectively set out
common law and statutory reach and apply claims against reach and
apply defendant Mark.[5]  Count Four sets out a UFTA claim against
reach and apply defendant Mark.  Except for the different reach
and apply defendants, the two actions are strikingly similar.  On
June 17, 2013, this court allowed a motion to consolidate the
cases and, in the course of discussing a motion to substitute,
explained that there was no consolidated amended complaint and,
accordingly, the two separate complaints in each action "are
retained in the consolidated action."[6]  (Docket Entry # 36,
Americus case, p. 34); (Docket Entry # 99, p. 34).

STANDARD OF REVIEW

---

[5]  This complaint likewise cites Massachusetts General Laws
chapter 213, section three, for the statutory reach and apply
claim in Count Three.  This court construes the count as brought
under Massachusetts General Laws chapter 214, section three.

[6]  This court urged the parties to confer and attempt to
stipulate to dismiss the duplicative claims and to file a joint
motion for leave to file a consolidated complaint setting out all
of the claims.  To date, the parties have not filed a joint
motion.
    Docket entries in the Americus case and the Allied case are
denoted as such whereas docket entries in this case are set out
without a case name.

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corporación De Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007).  It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a). It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side."  Pierce v. Cotuit Fire District, 741 F.3d 295, 301 (1st Cir. 2014); see also Caban-Rodriguez v. Jimenez-Perez, 2014 WL 959489, at *1 (1st Cir. March 12, 2014) (applying "the same legal standard as the district court" when reviewing summary judgment).

"Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'"  Green Mountain Realty Corp. v. Leonard, 2014 WL 1613704, at *6 (1st Cir. April 23, 2014).  The evidence is viewed "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor.  Ahmed v. Johnson, 2014 WL 2111236, at *3 (1st Cir. May 21, 2014).  Where, as here, the nonmovant bears the burden of proof at trial, he "must point to facts memorialized by materials of evidentiary

5

quality and reasonable inferences therefrom to forestall the entry of summary judgment." Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014); see Woodward v. Emulex Corp., 714 F.3d 632, 637 (1st Cir. 2013) (as to issues on which nonmovant bears burden of proof, he must "'demonstrate that a trier of fact reasonably could find in his favor'").

In reviewing a summary judgment motion, a court may examine "all of the record materials on file," Ahmed v. Johnson, 2014 WL 2111236, at *3, "including depositions, documents, electronically stored information, affidavits or declarations . . . or other material." Fed.R.Civ.P. 56(c)(1). "Unsupported allegations and speculation" however "do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see Serra v. Quantum Servicing, Corp., 747 F.3d 37, 40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded"). Adhering to this framework and construing the facts in Americus' favor, the record sets out the following facts.[7]

FACTUAL BACKGROUND

From 1995 to the time of Belli's death, Mark, who was not

_____

[7] Citations to the record are provided only for direct quotations.

married to Belli, considered herself Belli's life partner.  In
1998, Belli moved into Mark's home in Milford, Massachusetts
where he resided until his death on February 20, 2012.

Up until August 24, 2007, Belli worked as a branch manager
at AHMCC branches in Milford and Foxboro, Massachusetts.  He was
also a branch manager at a number of other AHMCC branches in
three other states.  As a branch manager, Belli "was entitled to
withdraw money" from a "Money Link account."  (Docket Entry #
140-12).  The account contained AHMCC's money that it
"contractually owe[d]" to Belli as a branch manager.  (Docket
Entry # 140-10).  AHMCC closed the Milford branch in August 2007
and terminated Belli's employment on August 24, 2007.[8]

Mark, a licensed real estate broker, began working at AHMCC
in September 1998 as an office manager and team leader in the

---

[8]  Defendants' LR 56.1 statement states that the "Money Link
Account Statements" carried a balance of $1,546,018.39 on August
23, 2007, and that AHMCC liquidated "The Belli Money Link
account" on August 24, 2007.  (Docket Entry # 138-1, ¶¶ 7-8).
Local Rule 56.1 statements must include "page references to
affidavits, depositions and other documentation."  LR 56.1.  The
paragraphs containing these statements refer to an affidavit by
Paul Belli, Belli's brother, and Money Link account statements.
Paul Belli's affidavit purports to authenticate his brother's
Money Link account statement in exhibit six.  Exhibit six is a
one page email.  (Docket Entry # 140-6).  Page one of the
affidavit indicates it was filed in a state court action in Texas
which might explain the discrepancy in the failure to attach the
Money Link account statements.
    The Money Link account statements Paul Belli attaches to a
letter in exhibit one are his "offices [sic] account" in West
Virginia.  (Docket Entry # 142-1).  They reflect a branch
transfer of $824,737.64 on August 13, 2007, which constitutes
almost the entire balance in the account.

Milford office.  She reported to Belli.  While at AHMCC, she worked in various capacities, including as a loan originator and processor, until her termination in August 2007 as a result of the branch's closure.  Thereafter, she continued to work as a real estate agent and, for a two month period, tried unsuccessfully to open a mortgage brokerage branch of Metro West Mortgage, Inc. ("Metro West") in Milford.  She invested $20,000 or $30,000 into the company from her savings, family and "a friend or two."  (Docket Entry # 140-9, pp. 51, 59).[9]  She could not recall their names.  Belli, however, did not give her any investment money for the business.  According to Mark, she supported Belli financially from the time he left AHMCC in August 2007 until his death.  She described Belli as not having any funds.  A February 2008 personal bank account statement reflects a zero balance.  (Docket Entry # 119-1).

AHMCC filed the aforementioned lawsuit in the Allied court against Belli and Regency on August 27, 2007.  The complaint sought to recover loan files, documents and equipment located at the Milford and Foxboro branch offices and it alleged that Belli and Regency made numerous misrepresentations causing AHMCC to pay undeserved bonuses to employees and unwarranted salaries to non-employees.  The complaint also sought access to computer servers

---

[9]  Page numbers refer to those on the docket as opposed to the pages in the deposition.

and other computer equipment located at a data center in Marlborough, Massachusetts.

On September 6, 2007, the Allied court issued a preliminary injunction. The injunction ordered AHMCC and Belli to work together to inventory the computer servers and the four networking devices at the Marlborough data center and to segregate AHMCC's data programs and applications on seven of the servers at the data center.[10] It also required AHMCC to pay the full cost of the lease.

In 2007, Ava Martinelli ("Martinelli"), the owner of Diamond Funding, decided to sell the company. In 2008, she advertised the business through a business broker by the name of Neary.[11] She also informed Todd McNulty ("McNulty"), a friend who was also in the mortgage business, to let her know if he knew anyone interested in buying the business. Other than Neary and McNulty, Martinelli did not do anything else to try and sell the

---

[10] The status of the proceedings in the Allied court are relevant in determining whether Belli's transfer of assets or funds in the summer of 2008 was a fraudulent transfer under the UFTA even though the final judgment did not enter until March 2011. A preliminary injunction order requires inter alia a finding of plaintiff's likelihood of success on the merits. See Corporate Technologies, Inc. v. Harnett, 731 F.3d 6, 9-10 (1st Cir. 2013); Peoples Federal Savings Bank v. People's United Bank, 672 F.3d 1, 9 (1st Cir. 2012) ("'cynosure of this four-part test is the movant's likelihood of success on the merits'") (internal ellipses omitted). The preliminary injunction order did not make an express finding of AHMCC's likelihood of success.

[11] She does not remember his first name.

9

business.[12]

In March or April 2008, Belli telephoned Martinelli
expressing an interest to purchase Diamond Funding.  The two
spoke about the business for approximately ten minutes.
Martinelli then referred Belli to her attorney, Sandy Resnick,
Esq. ("Attorney Resnick").  Attorney Resnick negotiated the sale
of the company thereafter.  According to Attorney Resnick,
Martinelli had worked out the terms of the deal.  The only name
he could recall as being part of the transaction was Belli.[13]

On April 7, 2008, Attorney Resnick emailed Belli's attorney,
Nicholas Ruscitti, Esq. ("Attorney Ruscitti").  The email
outlined the deal negotiated by Martinelli as consisting of a
transfer of 100% stock in Diamond Funding to Belli for $50,000
together with a $6,150 non-refundable deposit and an additional
$2,000 deposit in the event the sale did not take place.
Negotiations about the details of the transaction continued over
the next few days with emails between these attorneys.  By April

---

[12] Mark testified that she heard about Martinelli's
interest in selling Diamond Funding from Kirk O'Brien
("O'Brien"), a friend of Mark's in the mortgage business.
Martinelli did not identify O'Brien as one of the two individuals
she spoke to about selling and advertising the business.  Mark
admits that Belli was the person who first contacted Martinelli
although Mark explained that she worked together with Belli.
Impeachment evidence not considered for the truth of the matter
asserted shows that McNulty telephoned Martinelli to explain that
he had given her number to Belli.  Belli telephoned and spoke
with Martinelli thereafter.

[13] He also authenticated his notes as a business record.

10, 2008, the purchase price increased to $56,150 with the $6,150 deposit due upon execution of a stock sale and purchase agreement, a payment of $20,000 at the closing and payment of the $30,000 balance in the form of a promissory note. Attorney Ruscitti testified that he did not represent Mark.

On April 14, 2008, there was a wire transfer of $6,150 from Attorney Ruscitti's Interest on Lawyers Trust Account ("IOLTA") to Attorney Resnick's IOLTA in connection with the sale of Diamond Funding. April 14, 2008, is also the date of a stock purchase and sale agreement referenced in a subsequent addendum and related documents as between Mark and Martinelli.[14] One week later on April 21, 2008, a second wire transfer took place again from Attorney Ruscitti's IOLTA to Attorney Resnick's IOLTA in the amount of $6,150. Attorney Ruscitti did not know the origin of the money and could not remember whether it came from Belli or Mark although he was "sure" that "one of them" had given it to him. (Docket Entry # 149-1, Ex. D, p. 22). In part because Attorney Ruscitti represented Belli and did not represent Mark, a reasonable factfinder could conclude that the $6,150 deposit came from Belli even considering Mark's testimony that she wired the money into Martinelli's account to pay the deposit and that Belli "was totally broke" after his August 2007 termination. (Docket

---

[14] The parties did not file a copy of the April 14, 2014 stock purchase and sale agreement.

Entry # 154-2) (Docket Entry # 140-9, pp. 61-62, 128).

In contrast to the foregoing, Mark testified that she pursued purchasing a mortgage business after the unsuccessful efforts to operate the Metro West branch in Milford. Belli helped her locate a mortgage company that *she* could purchase, according to Mark's deposition testimony. In the spring of 2008, Mark contacted her attorney, David F. Hadlock, Esq. ("Attorney Hadlock"), who thereafter represented her in connection with the purchase of Diamond Funding. It was his understanding that Mark, as opposed to Belli, would be purchasing Diamond Funding and that she directed the acquisition.

A "couple weeks" after Belli's initial telephone call to Martinelli, he telephoned her again. Martinelli could not remember the exact date but did recall that the discussion took place "prior to drawing up the documents." (Docket Entry # 140-8, pp. 5-6). During the conversation, Belli told her that Mark would be purchasing the company at which point Martinelli grew concerned about the security and the collateral for the purchase.[15] As a result, she spoke to her attorney who then "drew up the paperwork" with Mark as the purchaser. (Docket Entry # 140-8, p. 6). The attorney "protected [Martinelli]

---

[15] Belli's statement, recited by Martinelli at her deposition, is not considered for the truth of the matter asserted but, rather, to explain the basis for Martinelli's concern and the reason for requiring Belli to sign a promissory note.

collateral wise by requiring [Belli] to sign the note so [Martinelli] would be paid back." (Docket Entry # 140-8, p. 6).

On May 13, 2008, Mark, as the buyer, and Martinelli, as the seller, signed an addendum to the stock purchase and sale agreement dated April 14, 2008. The addendum refers to a non-refundable payment of $20,000 by the buyer and the seller's right to retain a $26,150 advance in the event regulatory authorities did not approve the change of ownership. In May 2008, Mark paid Martinelli the $20,000 deposit by wiring the money into her account from Mark's "Metro Home Mortgage account." (Docket Entry # 140-9, pp. 128-129). Mark was unable to pinpoint the source of the funds in the Metro Home Mortgage account except insofar as the money came "from family" and "a personal friend, friends." (Docket Entry # 140-1, pp. 128-130). She insists that Belli did not provide any funds for the purchase of the company or give any money to Diamond Funding.

Also on May 13, 2008, Belli and Mark executed the promissory note. Under the note, they agreed to pay $30,000 with interest in equal installments of $2,241.22 over a 14 month time period. The record includes copies of five checks in the amount of $2,241.22 payable to Martinelli and bearing the name and address of either Metro West or Diamond Funding. Mark testified that, "We paid the note in full." (Docket Entry # 140-9, p. 138).

As structured, the transaction included an interim period

from May to October 2008. Mark began operating the company during this period albeit working for Martinelli. Mark testified that Belli did not contribute any money to Diamond Funding, did not sign any checks and only acted as a "support system" during this time period. (Docket Entry # 140-9, p. 149). He did not perform any work, according to Mark.

Mark was responsible for Diamond Funding's operating expenses during the transitional period. When asked at her deposition if Diamond Funding was making money during this time period, she answered, "Not very much." (Docket Entry # 140-9, p. 132). Although not completely sure, she estimated the amount of income as between $25,000 and $50,000. In August 2008, the company's bank account carried a balance of "over $130,000" and the company's income statement reflected year to date revenue of slightly more than $110,000. (Docket Entry # 140-9, pp. 163-164). In August 2008, Jim Slowey began working at the company albeit for "virtually no money at first." (Docket Entry # 140-9, p. 156). The company also employed a loan processor and paid her an annual salary of "around $40,000 a year." (Docket Entry # 140-9, p. 158).

In 2008, Belli made "a capital contribution" by transferring furniture and equipment "that he owned" to Mark for Diamond

Funding that had a dollar value of either $400,000 or $500,000.[16]

(Docket Entry # 149-1, pp. 125-126) (Docket Entry # 140-9, pp.

166, 168, 182-183). The furniture and equipment included

cubicles, a copier, a telephone system, "conference room desks,

file cabinets" and shredders but did not include "computer

systems."[17]  (Docket Entry # 140-9, pp. 166-169).  At her

deposition, Mark characterized the transfer a number of times as

_____

[16]  The record also provides sufficient evidence that Belli
made a direct transfer of the furniture and equipment to Diamond
Funding.

[17]  The final judgment in the Allied case awarded AHMCC
"exclusive ownership and possession" of 17 pieces of "computer
equipment," including computer servers. (Docket Entry # 324,
Allied case).  Citing the judgment, defendants argue that "res
judicata, claim splitting and double recovery as to personal
property" prevent any "colorable claim" in this action to recover
the equipment in the "rental or storage facility" because Belli
never possessed the property. (Docket Entry # 139, p. 17).  Even
if true, the transferred equipment and furniture did not include
computer systems, according to Mark.  A factfinder could easily
find that the transfer of the equipment and furniture included
items not awarded to AHMCC in the final judgment.  Consequently,
the argument that Belli did not have possession of the "equipment
identified in the Default Judgment" does not warrant summary
judgment on the reach and apply or UFTA claims.  As discussed
infra, it is a genuine issue of material fact as to whether Belli
owned and possessed the furniture and equipment and then
transferred it to Mark or Diamond Funding.
     Defendants' similar argument that Americus has no evidence
that Diamond Funding has the telephone system or television
(Docket Entry # 139, p. 18) is also misplaced.  The record
contains sufficient evidence that Belli transferred equipment and
furniture that included the telephone system and it is also
reasonable to infer that the equipment included a television.
     Finally, it is a genuine issue of material fact whether the
aforementioned furniture and equipment worth $400,000 or $500,000
transferred to Mark or Diamond Funding is the same equipment that
Belli sold at a weekend sale and for which the Allied court
awarded AHMCC $75,000 on a conversion claim.  (Docket Entry #
320, pp. 22-23, Allied case) (Docket Entry # 324, Allied case).

15

a gift from Belli but, as noted above, also referred to it once
as "a capital contribution" and elsewhere as a "purchase."
(Docket Entry # 149-1, pp. 125-126) (Docket Entry # 140-9, pp.
166-169). She also testified that Belli gave her the furniture
because she was paying "his bills and providing him with a place
to live." (Docket Entry # 140-9, p. 170). Diamond Funding's
2008 end of the year balance sheet places a value of $518,363.07
on furniture and fixtures. Examining the entire record, a
reasonable factfinder could conclude that Belli made a capital
contribution of furniture and equipment that he owned and
transferred that furniture and equipment to Mark for use by
Diamond Funding.[18] The summary judgment record fails to include
the exact date of the transfer. A reasonable factfinder could

---

[18] Paragraph six in defendants' LR. 56.1 statement states
that:

> The Amended Verified Complaint submitted by AHMCC on
> September 11, 2007, id, contains an attached Exhibit "A"
> which lists all the equipment allegedly in the possession of
> Belli. It does not list or contain any reference to a phone
> system or plasma TV, only the computer equipment that is
> awarded to Allied in the Default Judgment.

(Docket Entry # 138-1, ¶ 6). AHMCC did not file an amended
verified complaint on September 11, 2007, in the Allied court.
Rather, it filed a first amended verified complaint against Belli
on September 4, 2007, but this pleading does not contain an
attached exhibit. Other than citing the docket entries for the
final judgment against Belli and a final judgment against
Regency, the above paragraph does not properly cite to the record
"with page references to affidavits, depositions and other
documentation," LR. 56.1, in violation of the rule. Accordingly,
defendants fail to establish this "fact" or an inference drawn
from it.

16

easily find that the transfer took place before the October 2008 transfer of ownership of the company.

In 2008 or "[m]aybe late 2008," Mark's cousin, John Martorano, gave her funds on two or three occasions, each time amounting to "[o]ver $10,000," to meet expenses and continue the business. (Docket Entry # 140-9, pp. 128-131) (Docket Entry # 140-1, pp. 97-98). The transitional period ended in mid-October 2008. On or about October 15, 2008, Martinelli transferred various licenses as well as the stock of the company to Mark and resigned from the company effective October 15, 2008. Mark thereby became the owner of the company. At the time of her April 2012 deposition, she held the titles of president, secretary and treasurer of Diamond Funding.

During the transitional period, the preliminary injunction in the Allied court remained in effect. In December 2007, the Allied court issued a trustee process writ of attachment against Regency on funds up to the amount of $1,411,725.74 held at a Milford bank. In July 2008, the Allied court denied without prejudice AHMCC's partial summary judgment motion on a replevin claim that sought a return of computer servers and networking devices in the Marlborough data center. In August 2008, the court allowed a motion to compel filed by AHMCC seeking disclosure of Belli's password in order to allow AHMCC access to relevant electronically stored information. In October 2008, the

court modified the preliminary injunction order to require that
Belli pay half of the storage lease at the Marlborough data
center. Except for a single payment of $1,472.50 in November
2008, Belli disobeyed the order by not paying these lease fees.
(Docket Entry # 146, Allied case). At the same time, the Allied
court allowed a separate motion seeking to compel Belli to comply
with the August Order and to impose sanctions. The Allied court
issued the sanctions award on November 12, 2008, in the amount of
$2,150.[19] On October 29, 2008, the Allied court allowed Belli
leave to file a counterclaim against AHMCC and a third party
complaint against Jim Hodge ("Hodge"), president of AHMCC, noting
that the "allegations appear to have some basis." (Oct. 29, 2008
Order, Allied case). The counterclaim against AHMCC, initially
filed without leave on September 30, 2008, sought return of
$500,000 that Belli expended in personal funds on the Milford
office, payments of expenses by Belli on various other AHMCC
offices and payment of his earned compensation. On February 9,

---

[19] Belli's misconduct led to a civil contempt finding in
July 2009 and culminated in the sanction of a default judgment in
September 2009. In entering the contempt finding, the Allied
court stated that, "[Belli] claims an inability to pay the lease
fees and sanctions, but he has not carried his burden in this
regard." (July 8, 2009 Order, Allied case). On August 14, 2009,
the Allied court awarded AHMCC $38,902 in attorney's fees and
costs for its repeated attempts to secure Belli's compliance with
court orders. Belli did not pay either the $38,902 sanction or
the $2,150 sanction.
    Defendants insist that Belli's failure to pay these modest
sanctions and allow a default judgment to enter against him
establishes that he did not have the funds to transfer any money
to Diamond Funding or to Mark for the purchase of the company.

18

2009, the Allied court allowed a motion to dismiss the third party complaint against Hodge as inadequately pled and allowed in part a motion to dismiss the counterclaim. In addition to entering the default judgment on September 22, 2009, the court struck the remaining claims in the counterclaim as a sanction.

In May 2010, AHMCC sold certain AHMCC branches to Allied Home Mortgage Corporation ("AHMC") as set forth in an asset purchase agreement. (Docket Entry # 140-5). The record includes a redacted copy of the agreement that fails to identify the branches excluded from the transaction. The assets from AHMCC's closed branches in Massachusetts however were not transferred. Likewise, the right to collect on the final judgment in the Allied case was not transferred.[20] (Docket Entry # 156-1).

In 2012, the United States sued Americus, Allquest Home

_____

[20] The asset purchase agreement between AHMCC and AHMC redacts most of the assets and liabilities excluded from the purchase. Based on the redacted asset purchase agreement and a negative inference drawn from the loss or destruction of documents, defendants submit that AHMCC sold the right to pursue collection of the March 2011 judgment to another Allied entity. In light of this purportedly established fact, defendants argue that Americus, formerly AHMCC, has no standing to pursue this action. (Docket Entry # 155-1).

Obligated to construe the summary judgment record in Americus' favor, it establishes the opposite, to wit, that the right to collect the judgment rendered by the Allied court was not transferred. (Docket Entry # 156-1). Because the facts do not support defendants' standing argument, defendants are not entitled to summary judgment based on lack of standing.

Finally, in a supplemental memorandum defendants quote various portions of a deposition of Michele Thieme Taylor but do not attach the quoted portions. (Docket Entry ## 155 & 155-3). The same deficiency exists in the corresponding filing in the Americus case. (Docket Entry ## 79 & 79-3, Americus case). The statements in the memorandum are therefore allegations as opposed to facts in the summary judgment record.

Mortgage Corporation (formerly known as AHMCC), Hodge and another officer for mortgage fraud in the United States District Court in the Southern District of Texas. The complaint alleges that these defendants violated the False Claims Act, 31 U.S.C. § 3729, and the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 1833a.[21] (Docket Entry # 140-4).

On March 20, 2013, AHMCC or Americus filed a notice of claim against the Estate of Peter Belli in the Probate and Family Court Department (Worcester Division) ("the probate court").[22] (Docket Entry # 75-1, Civil Action No. 12-10861-GAO). Mark attests that Belli was ineligible to own a mortgage brokerage in 2008 because of "his financial situation and associated registration and licensing requirements for which he would not have qualified." (Docket Entry # 140-13, ¶ 7) (Docket Entry # 140-9, p. 61).

<u>DISCUSSION</u>

Defendants seek summary judgment on all of the counts in the second amended complaint. They also challenge this court's jurisdiction based on the probate exception to diversity

---

[21] In seeking summary judgment, defendants also filed a November 1, 2011 newspaper article describing another mortgage fraud suit brought by the United States against AHMCC in the United States District Court in the Southern District of New York. (Docket Entry # 140-3).

[22] The notice of claim does not identify the filing party. It does state that the Estate of Peter Belli is indebted "to the undersigned . . . for monies owed under" the final judgment in the Allied court. (Docket Entry # 75-1, Americus case). The record thus reasonably infers that either Americus or AHMCC filed the notice.

jurisdiction.  Defendants' arguments based on standing are not
suitable for summary judgment.[23]

I.   <u>Statutory and Common Law Reach and Apply Claims</u>

    With respect to the statutory reach and apply claim under
chapter 214, defendants argue that Belli did not invest or
contribute any money to purchase Diamond Funding.  They also
maintain that no constructive trust arose for the monetary value
of Belli's services.

    Under chapter 214, section 3(6), "a creditor may 'reach and
apply' a debtor's interest in property that cannot otherwise be
executed against in an action at law."  <u>Iantosca v. Benistar
Admin. Services, Inc.</u>, 843 F.Supp.2d 148, 152 (D.Mass. 2012);
Mass. Gen. L. ch. 214, § 3(6) (creditor may "reach and apply"
debtor's interest in property that "cannot be reached to be
attached or taken on execution"); <u>Springfield Redevelopment
Authority v. Garcia</u>, 691 N.E.2d 965, 968 (Mass.App.Ct. 1998)
(reach and apply action requires establishing indebtedness of
"principal defendant to the plaintiff" and "collecting the debt,
when established, out of property rights which cannot be reached
on an execution") (internal quotation marks omitted).  A chapter
214, section 3(6) claim to reach and apply is a two step process.
<u>Massachusetts Electric Co. v. Athol One, Inc.</u>, 462 N.E.2d 1370,
1372 (Mass. 1984).  The first step is to establish the debt.  <u>Id.</u>

---

[23]   See fn. 20.

Americus satisfies that step because it is a judgment creditor.

"'The second [step] is the process for collecting the debt, when established, out of property rights which cannot be reached on an execution.'" Papamechail v. Holyoke Mutual Ins. Co., 397 N.E.2d 1153, 1155-1156 & n.5 (Mass.App.Ct. 1979). Recovery under this step requires plaintiff to show that the "property, by its nature, is incapable of attachment or of taking on execution in a legal action." Massachusetts Electric Co. v. Athol One, Inc., 462 N.E.2d at 1372; see In re Rare Coin Galleries of America, Inc., 862 F.2d 896, 904 (1st Cir. 1988) ("creditor can reach and apply in payment of any 'debt' a variety of a debtor's interests that are unavailable for ordinary attachment or levy"). An equitable asset of the debtor held in trust is a classic example of a debtor's interest not recognized by a court of law.[24] See Cavadi v. DeYeso, 941 N.E.2d 23, 32 (Mass. 2011) ("intangible assets and assets held in trust" are "classic examples" of equitable assets "not recognized by courts of law"); see also Eaton v. Federal Nat. Mortgage Association, 969 N.E.2d 1118, 1125 n.10 (Mass. 2012) (describing resulting trust in that case as "an equitable device").

---

[24] As noted below, a resulting trust may arise up to the amount of the $6,150 down payment. Defendants do not argue that the statutory reach and apply claim displaces the common law reach and apply claim. See generally Foster v. Evans, 429 N.E.2d 995, 998 (Mass. 1981) (dicta noting that "creation of a statutory action to reach and apply did not abolish the older equitable action").

Defendants' attack on the chapter 214, section 3(6) claim is not based on the foregoing but, instead, on the inability of Belli to transfer any funds to Mark or Diamond Funding because he "had no funds of his own" at the relevant time from April to October 2008. (Docket Entry # 139, p. 11) (Docket Entry # 154, p. 3) (facts do not allow inference that "Belli had the means to purchase Diamond Funding"). Defendants insist that Belli's funds were not used to purchase Diamond Funding and that Belli did not provide any uncompensated services to the company. Defendants additionally rely on the understanding of Attorney Hadlock and Martinelli that it was Mark who was purchasing the company. Mark, in turn, testified that she used her own funds and that Belli, who she was supporting financially, had no funds of his own. (Docket Entry ## 139, 154).

The difficulty with this argument is that a factfinder could conclude that in April 2008 Belli contributed $6,150 as a deposit towards the purchase price of Diamond Funding. As explained more fully above, Attorney Ruscitti, Belli's attorney, maintained an IOLTA. On April 14, 2008, the date of the stock purchase and sale, there was a wire transfer of $6,150 from that account to Attorney Resnick's IOLTA in connection with the sale of Diamond Funding. The fact that Belli chose not to pay a $2,150 sanction in November 2008 and thereafter,[25] while relevant to his lack of

---

[25]   See fn. 19.

funds as argued by defendant, does not destroy the ability of a factfinder to draw the reasonable inference that Belli had the means on April 14, 2008, to pay and did pay the $6,150 deposit towards the purchase price of the company.

Defendants make the same argument with respect to the common law reach and apply claim. The same reasoning precludes summary judgment on that claim.

With respect to both the common law and statutory reach and apply claims, defendants next maintain that even assuming that Belli transferred funds or assets to purchase Diamond Funding, the presumption of a donative intent arises because Mark was his life partner. They also point out that Belli received consideration for the transfer because Mark was providing a home and paying his bills.[26] (Docket Entry # 139, 154).

At common law, a resulting trust may arise "where 'a transfer of property is made to one person and the purchase price is paid by another; in such a case a trust results in favor of the person who furnished the consideration.'" Cavadi v. DeYeso, 941 N.E.2d at 33 (quoting Maffei v. Roman Catholic Archbishop of Boston, 867 N.E.2d 300, 317 (Mass. 2007), and citing Restatement (Third) of Trusts § 7 cmt. C (2003)); see also Eaton v. Federal

---

[26] Mark testified that Belli gave her the furniture and equipment because she "was carrying him and helping him pay his bills and providing him with a place to live." (Docket Entry # 140-9, p. 170).

24

National Mortgage Association, 969 N.E.2d at 1125 n.10 (quoting

Restatement (Third) of Trusts § 7 (2003)).  This rule applies

even when only "a portion of the purchase price is paid by one or

more persons, the rest being paid by the transferee," Restatement

(Third) of Trusts § 9, illus. 5 (2003), i.e., Mark.  See

generally Cavadi v. DeYeso, 941 N.E.2d at 37 (adhering to

Restatement (Third) of Trusts §§ 7, 9 (2003), albeit for

different principle).  As explained by the court in Maffei,

however, "a resulting trust pivots on the key element of

intention" and the transferor furnishing the consideration "must

not intend to do so as 'a gift or advancement.'"  Maffei v. Roman

Catholic Archbishop of Boston, 867 N.E.2d at 317; Cavadi v.

DeYeso, 941 N.E.2d at 36-37.  Consequently, when "a purchaser

takes title in the name of a family member, the likelihood that

the purchaser intended to bestow a gift may rebut the presumption

of a resulting trust."  Cavadi v. DeYeso, 941 N.E.2d at 37; see

Citizens Bank of Massachusetts v. Coleman, 987 N.E.2d 1282, 1287

(Mass.App.Ct. 2013) ("no presumption of a resulting trust" when

there is gratuitous transfer to family member).  The presumption

of a gift "is not conclusive" and "may be rebutted in whole or in

part by evidence of a different intention."  Citizens Bank of

Massachusetts v. Coleman, 987 N.E.2d at 1287.  The intent at

issue in the context of a resulting trust "merely requires proof

that the person holding title not also hold the beneficial

interest." <u>Cavadi v. DeYeso</u>, 941 N.E.2d at 33.

The question of whether Belli intended to bestow a gift of $6,150 on Mark or intended to retain the beneficial interest remains a genuine issue of material fact. Belli made the first contact to Martinelli. He did not mention Mark or convey any intention to make a gift at that time. Rather, he expressed a desire to purchase the company. Attorney Resnick could only remember Belli as involved in the transaction. His business records make no mention to gift a portion of the company to Mark. Attorney Ruscitti represented Belli as opposed to Mark and the transfer was made to and then from Attorney Ruscitti's IOLTA. Recognizing the presumption of donative intent, the summary judgment record includes sufficient evidence to overcome the presumption and allow a factfinder to find in Americus' favor.[27]

II. <u>UFTA</u>

Defendants move for summary judgment on the UFTA claim because Belli did not become a "debtor" of AHMCC until the March 2011 judgment.[28] Defendants also argue that Belli did not have

---

[27] Because the $6,150 transfer provides a basis for the common law and statutory reach and apply claims in counts II and III, it is not necessary to discuss Belli's contribution of services and labor to the company as subject to being reached and applied towards the judgment in the Allied case.

[28] Defendants phrase the argument as follows:

The entire claim is without merit based on the indisputable fact that Belli did not become a *creditor* of Allied until March, 2011. See docket 235. Since Belli was not a *creditor* in 2008, the statute does apply. Only if Belli was

26

the intent to make himself insolvent at the time of the transfer, partly because he was already insolvent when AHMCC "confiscated his Money Link account," or the intent to transfer an interest to Diamond Funding for fraudulent purposes. (Docket Entry ## 139, 154). Defendants reason that such an intent would mean that Belli knew that the Allied action would result in a judgment against him at the time he made the transfer even though he filed the counterclaim on September 30, 2008, and sanctions did not issue until November 2008.

Statutory interpretation "always starts with the language of the statute itself." Matamoros v. Starbucks Corp., 699 F.3d 129, 134 (1st Cir. 2012) (interpreting Massachusetts law). Typically, "the ordinary meaning of the statutory language" applies. Id. "[R]esort to extrinsic aids to statutory construction (such as legislative history)" is appropriate "only when the wording of the statute is freighted with ambiguity or leads to an unreasonable result." Id.

The UFTA "does not create new claims" but, instead, provides an expeditious means for creditors to satisfy their claims. See Silica Tech, L.L.C. v. J-Fiber, GmbH, 2009 WL 2579432, at *17

---

a debtor of Allied's on the date of a specific transfer of property could it apply.

(Docket Entry # 139) (emphasis added). This court assumes that defendants meant to argue that Belli did not become a "debtor" of Allied until the March 2011 judgment.

(D.Mass. Aug. 19, 2009). It prescribes a "transfer" made by the
"debtor" with either the "actual intent to hinder, delay, or
defraud any creditor of the debtor," Mass. Gen. L. ch. 109A, §
5(a)(1), or made by the debtor without receiving a "'reasonably
equivalent value' in return and either" having an unreasonably
small amount of remaining assets or an intent or reasonable
belief that "the transfer would render [him] insolvent."[29]
<u>Silica Tech, L.L.C. v. J-Fiber, GmbH</u>, 2009 WL 2579432, at *17;
Mass. Gen. L. ch. 109A, § 5(a)(2).

A "transfer" is defined as "parting with an asset" and an
"asset" is simply "property of a debtor." Mass. Gen. L. ch.
109A, § 2. Belli's transfer of either the $6,150 or the
furniture and equipment that Belli owned therefore constitutes an

---

[29] In pertinent part, the statute reads as follows:

(a) A transfer made or obligation incurred by a debtor is
fraudulent as to a creditor, whether the creditor's claim
arose before or after the transfer was made or the
obligation was incurred, if the debtor made the transfer or
incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any
creditor of the debtor; or

(2) without receiving a reasonably equivalent value in
exchange for the transfer or obligation, and the debtor: (i)
was engaged or was about to engage in a business or a
transaction for which the remaining assets of the debtor
were unreasonably small in relation to the business or
transaction; or (ii) intended to incur, or believed or
reasonably should have believed that he would incur, debts
beyond his ability to pay as they became due.

Mass. Gen L. ch. 109A, § 5(a).

28

"asset" within the meaning of the statute.

Notably, the statute prescribes a transfer as fraudulent regardless of "whether the creditor's claim arose before *or after* the transfer was made." Mass. Gen. L. ch. 109A, § 5(a) (emphasis added); see also Rockingham County Nursing Home v. Harnois, 2014 WL 176580, at *10 (D.Mass. Jan. 10, 2014) ("[s]ection 5 of the UFTA makes a transfer or obligation fraudulent as to both present and future creditors 'if there is actual intent to hinder, delay or defraud'"). A "creditor" is anyone "who has a claim" and a "debtor" is anyone "who is liable on a claim." Mass. Gen. L. ch. 109A, § 2. A "claim" is "a right to payment, whether or not the right is reduced to judgment, . . . contingent, matured [or] unmatured." Mass. Gen. L. ch. 109A, § 2. An unmatured right to payment therefore constitutes a "claim." Mass. Gen. L. ch. 109A, § 2.

Here, the claim could therefore arise after the transfers of $6,150 and/or the furniture and equipment. The definition of a "claim," defined as a "right to payment," does not require reducing the claim to a judgment and the claim may be contingent and unmatured. Under the foregoing definitions and the language in section 5(a) that includes claims that arise after the transfer, a contingent tort claim that is subject to ongoing litigation at the time of a transfer yet not reduced to a judgment may under certain circumstances constitute a "claim"

29

within the meaning of the statute.

To the extent there is any ambiguity, a comment by the Committee that acted for the National Conference of Commissioners on Uniform State Laws in preparing the Uniform Fraudulent Transfer Act supports this construction. As explained in comment four to the Uniform Fraudulent Transfer Act, section one, upon which chapter 109A is based, the:

> definition of "creditor" in combination with the definition of "claim" has substantially the same effect as the definition of "creditor" under § 1 of the Uniform Fraudulent Conveyance Act. As under that Act, the holder of an unliquidated tort claim or a contingent claim may be a creditor protected by this Act.

Unif. Fraudulent Transfer Act 1984, § 1 cmt. 4, 7A U.L.A. 16, pt. II; see Cavadi v. DeYeso, 941 N.E.2d at 35 (relying and quoting comment two in the Uniform Fraudulent Transfer Act to support principle that the Massachusetts UFTA did not displace all common law claims); see also Silica Tech, L.L.C. v. J-Fiber, GmbH, 2009 WL 2579432, at *34 (dicta that "a plaintiff filing a tort claim against a defendant is a 'creditor' under the UFCA[30] and can attack the transfer of property owned by the plaintiff and the defendant as tenants by the entirety even before judgment is rendered") (citing Hoult v. Hoult, 862 F.Supp. 644, 649 (D.Mass.

---

[30] "The UFCA is an acronym for the Uniform Fraudulent Conveyance Act," previously codified in chapter 109A. Silica Tech, L.L.C. v. J-Fiber, GmbH, 2009 WL 2579432, at *17. The UFCA is "the predecessor statute to the UFTA." Id. The Massachusetts legislature repealed the UFCA in 1996 and replaced it with the UFTA. Id.; see Federal Refinance Co., Inc. v. Klock, 352 F.3d 16, 22 n.2 (1st Cir. 2003).

1994)); <u>Hoult v. Hoult</u>, 862 F.Supp. at 649 ("plaintiff has standing to raise a fraudulent conveyance claim, even where the alleged conveyance occurred subsequent to the transactions forming the basis of the underlying claim and before the plaintiff obtains a judgment against the conveyancer").

A genuine issue of material fact therefore exists as to whether Belli is a "debtor," i.e., a person liable on a claim that arose before or after the transfer. Defendants' argument that Belli did not become a debtor until the March 2011 final judgment therefore does not warrant summary judgment.

Turning to defendants' intent arguments, AHMCC filed the Allied case in August 2007 and the claim matured into a judgment in March 2011. Belli made the transfer of $6,150 on April 14, 2008, and the furniture and equipment before the October 2008 transfer of stock. The furniture and equipment were worth either $400,000 or $500,000.

Belli's actual intent to transfer the furniture and equipment in order to "delay, hinder, or defraud" AHMCC, a creditor with a claim that arose after the transfer, is assessed "at the time of the alleged fraudulent conveyances" as opposed to "at some other time in the past." <u>Palmer v. Murphy</u>, 677 N.E.2d 247, 255 (Mass.App.Ct. 1997). Section 5(b) sets out a non-exclusive list of relevant factors to assess in determining "actual intent." Mass. Gen. L. ch. 109A, § 5(b); <u>AngioDynamics,</u>

<u>Inc. v. Biolitec AG</u>, 711 F.3d 248, 251 (1st Cir. 2013).

A number of these factors lend support for a finding that Belli transferred the furniture and equipment with the actual intent to delay or defraud AHMCC. These include: (1) whether "the transfer or obligation was to an insider";[31] (2) whether "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit"; (3) whether "the transfer was of substantially all the debtor's assets"; (4) whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred"; and (5) whether "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." Mass. Gen. L. ch. 109A, § 5(b).

Whereas Belli may have had the means to transfer $6,150 without rendering himself insolvent, the transfer of $400,000 or $500,000 worth of furniture and equipment would produce a significantly greater reduction to his total assets. There is little indication that Belli received any consideration for the

_____

[31] An "insider" includes a "relative of the debtor," a relationship similar to Belli and Mark who were lifetime partners. <u>See</u>, <u>e.g.</u>, <u>Norwood Cooperative Bank v. Gibbs</u>, 2012 WL 4094328, at *7 (D.Mass. Sept. 13, 2012) (although transferor and transferee were no longer married, their closeness and lack of indicia showing arm's length transaction made transferee an insider).

furniture and equipment. The transfer occurred when he was subject to the Allied action. In light of the significant value attributed to the furniture and equipment, a factfinder could conclude that the transfer involved substantially all of Belli's remaining assets. Accordingly, whether Belli had the actual intent to transfer the furniture and equipment to hinder, delay or defraud AHMCC presents a genuine issue of material fact.[32]

Defendants raise an additional argument in their reply brief. They assert there is no evidence that AHMCC could have reached the transferred property prior to the transfer. (Docket Entry # 154).

Although a litigant may use a reply brief to clarify arguments previously made or to respond to an argument an opposing party raises in an opposition, ordinarily it is not appropriate to use a reply brief to raise a new argument. <u>See United States v. Bradstreet</u>, 207 F.3d 76, 80 n.1 (1st Cir. 2000) ("While a reply brief is not the proper place to raise new arguments, it is proper for a court to look there for clarification") (internal citations omitted); <u>accord</u> <u>Gove v. Career Systems Development Corp.</u>, 689 F.3d 1, 11 n.7 (1st Cir.

---

[32] It is therefore unnecessary to determine whether any uncompensated services Belli rendered to Diamond Finding constitute a "transfer" or conveyance within the meaning of the UFTA. Likewise, it is not necessary to address the transfer of the $6,150 as a fraudulent transfer given the recommendation to deny Count IV based on the transfer of the furniture and equipment as a fraudulent transfer.

2012).  There is no reason why defendants could not have raised the argument in the supporting memorandum.  With the first round of briefing concluded, Americus did not have the opportunity to address the argument.  In this court's discretion, this court declines to consider it.  See CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 97 F.3d 1504, 1526 (1st Cir. 1996) (courts are "entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion"); McCoy v. MIT, 950 F.2d 13, 23 (1st Cir. 1991) ("plaintiff has an affirmative responsibility to put his best foot forward in an effort to present some legal theory that will support his claim"); In re Boston Regional Medical Center, Inc., 328 F.Supp.2d 130, 143 (D.Mass. 2004); see, e.g., United States v. Isler, 429 F.3d 19, 30 (1st Cir. 2005) (finding "a related argument that the district court erroneously applied the guidelines standard rather than the statutory standard" in reply brief and at oral argument "forfeited").

III.  Claim and Issue Preclusion and Double Recovery

Defendants maintain that because the Allied court awarded AHMCC money damages of $75,000 for the television and the telephone system, Americus cannot reach and apply this same equipment to satisfy the judgment in the Allied case under principles of "res judicata, collateral estoppel and case estoppel" as well the bar against "double recovery."  (Docket

Entry # 139, p. 18).[33] The second amended complaint alleges that Belli transferred furniture and equipment, including a telephone system and a plasma television to Mark or Diamond Funding as "a capital contribution" to Diamond Funding. (Docket Entry # 104-1, ¶ 25). Americus argues that this court previously addressed these arguments. (Docket Entry # 150).

In the Americus case, reach and apply defendant Mark raised these same res judicata, collateral estoppel and double recovery arguments in a memorandum in support of a motion to dismiss. (Docket Entry # 45, pp. 5-6, Americus case). This court addressed and rejected the arguments in a Report and Recommendation. (Docket Entry # 74, pp. 15-22, Americus case). On March 31, 2014, the district judge adopted the Report and Recommendation. (Docket Entry # 80, Americus case).

In essence, defendants seek reconsideration of the district judge's ruling denying the motion to dismiss and adopting the Report and Recommendation in the Americus case. As an interlocutory order, a denial of a motion to dismiss remains subject to reconsideration. Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005) ("interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case");

---

[33] Defendants raise a related argument in this section of the supporting memorandum. (Docket Entry # 139, p. 17). Footnote 17 addresses and rejects the argument.

35

<u>Latin American Music Co. Inc. v. Media Power Group, Inc.</u>, 705
F.3d 34, 40 (1st Cir. 2013) (quoting <u>Harlow v. Children's Hosp.</u>,
432 F.3d at 55).  Reconsideration is "proper where the movant
shows a manifest error of law or newly discovered evidence, or
where the district court has misunderstood a party or made an
error of apprehension." <u>Villanueva v. United States</u>, 662 F.3d
124, 128 (1st Cir. 2011).

Because defendants raised the arguments in the context of a
motion to dismiss as opposed to the present motion for summary
judgment and this case, although consolidated with the Americus
action, is brought against a different trustee process defendant,
this court addresses the substance of the arguments.  The same
reasons nonetheless provide the basis to reject the arguments.[34]

Turning to the arguments, in the course of deciding the
amount of damages, the Allied court determined that the property
at the Milford and Foxboro offices included "'copy machines,
computers, a plasma display and a digital camera, which are all
owned by Allied.'"  (Docket Entry # 320, p. 22, Allied case).
The court additionally noted that, notwithstanding numerous
demands made by AHMCC, Belli refused to return the property.
Although AHMCC originally sought the fair market value of the
equipment and the property "stored in the former Milford and

---

[34]  By and large, therefore, the reasoning here repeats, in
more abbreviated fashion, the reasoning in the prior Report and
Recommendation.

Foxboro offices," it abandoned the request because "Belli wrongfully spoliated" the property "at a weekend sale, in defiance of [the Allied court's] preliminary injunctions." (Docket Entry # 320, p. 23, Allied case). In lieu of the fair market value, AHMCC sought "only $75,000" which the final judgment awarded as damages under the conversion claim along with prejudgment interest. (Docket Entry # 320, p. 23, Allied case).

Claim preclusion under Massachusetts law requires three elements: "(1) the identity or privity of the parties to the present and prior actions; (2) identity of the cause of action; and (3) prior final judgment on the merits." Gloucester Marine Railways Corp. v. Charles Parisi, Inc., 631 N.E.2d 1021, 1024 (Mass.App.Ct. 1994); see Iantosca v. Step Plan Services, Inc., 604 F.3d 24, 30 (1st Cir. 2010) ("[i]n considering the preclusive effect of a Massachusetts judgment, we look to Massachusetts law"). A default judgment as a discovery sanction is not a judgment on the merits on the underlying claims. See Treglia v. MacDonald, 717 N.E.2d 249, 253 (Mass. 1999) ("reaffirm[ing] that preclusive effect should not be given to issues or claims that were not actually litigated in a prior action" and "that generally in the case of a judgment entered by default, none of the issues is actually litigated or decided").

Issue preclusion bars "'relitigation of an issue determined in an earlier action where the same issue arises in a later

37

action, based on a different claim, between the same parties or their privies.'" Kobrin v. Board of Registration in Medicine, 832 N.E.2d 628, 634 (Mass. 2005); accord Anusavice v. Board of Registration in Dentistry, 889 N.E.2d 953, 963 n.16 (Mass. 2008). It requires establishing that "'(1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom estoppel is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication is identical to the issue in the current adjudication.'" Kobrin v. Board of Registration in Medicine, 832 N.E.2d at 634. Furthermore, "'the issue decided in the prior adjudication must have been essential to the earlier judgment.'" Id.

The issue of whether AHMCC was entitled to enforce the judgment and reach the plasma television or telephone system to satisfy the judgment was neither litigated nor decided in the Allied case. The Allied court rendered a default judgment as a sanction and determined the amount of damages. Massachusetts law does not afford preclusive effect to issues or claims not decided on the merits but, instead, "decided" in a default judgment rendered as a discovery sanction. See Treglia v. MacDonald, 717 N.E.2d at 253; In re Strangie, 192 F.3d 192, 194 (1st Cir. 1999); Dawe v. Capital One Bank, 456 F.Supp.2d 236, 241 (D.Mass. 2006) ("issue preclusion is not

applicable in the present case, as the state court action was dismissed as a discovery sanction for Capital One's failure to comply with the court's discovery order"). Issue preclusion applies "to determinations made during proceedings in which the parties had an adequate opportunity to litigate the issues decided." Foster v. Evans, 429 N.E.2d at 1000 (denying preclusion because order dissolving attachment was not decision on the merits and not essential to the judgment).

With respect to the double recovery argument, it is well settled that, "The law abhors duplicative recoveries; thus double awards for the same injury are impermissible." Bogan v. City of Boston, 489 F.3d 417, 425 (1st Cir. 2007) (internal brackets and quotation marks omitted); accord Acevedo-Garcia v. Monroig, 351 F.3d 547, 567 (1st Cir. 2003) ("double awards for the same injury are impermissible"). Americus has yet to recover the $75,000 award of damages on the conversion claim in the Allied case. Even assuming that it is seeking to reach the same equipment as sought in the conversion claim, i.e., the plasma television and telephone system, the purpose is to satisfy the existing $75,000 award. The introductory paragraph in the second amended complaint and the prayer for relief seek property in the possession of Diamond Funding "up to the amount of the Judgment." (Docket Entry # 104). The complaint does not seek an amount greater than the judgment. Americus is not seeking a recovery of

both the equipment and $75,000. Rather, it is seeking the
equipment as a means to satisfy no more than the amount of the
judgment. Summary judgment on the reach and apply and/or UFTA
claims based on claim and issue preclusion or double recovery is
not warranted.

IV.  <u>Probate Jurisdiction</u>

The remaining argument concerns the jurisdictional issue of
whether the probate exception to diversity jurisdiction applies.
In the aforementioned Report and Recommendation in the Americus
case, this court allowed further briefing "limited solely to the
application of the probate exception to diversity jurisdiction as
it applies to this case." (Docket Entry # 74, Americus case).
The parties in the Americus case each filed a supplemental brief
addressing the probate exception to diversity jurisdiction.
(Docket Entry ## 75 & 76, Americus case). They raise similar but
abbreviated arguments relative to jurisdiction in this case.
(Docket Entry ## 139 & 150). For reasons explained in a Report
and Recommendation in the Americus case addressing a summary
judgment motion (Docket Entry # 58, Americus case), the probate
exception to diversity jurisdiction does not apply.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court

**RECOMMENDS**[35] that the motion for summary judgment (Docket Entry # 138) be **DENIED**.  The parties shall appear for a hearing on the motion for instructions or dissolution of the preliminary injunction (Docket Entry # 157) on July 24, 2014, at 3:00 p.m.


　　/s/ Marianne B. Bowler　　
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[35] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  <u>See</u> Rule 72(b), Fed. R. Civ. P.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.